UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Lewis Bailey, | ) **C/A No. 4:08-1630-HFF-TER** |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )REPORT AND RECOMMENDATION |
| | ) |
| John Ozmint, Director of the South Carolina Department of | ) |
| Corrections; | ) |
| Tim Riley, Warden of Tyger River Correctional Institution; | ) |
| and | ) |
| Sgt. John Long, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

## I.  PROCEDURAL BACKGROUND

The plaintiff, Lewis Bailey ("plaintiff/Bailey"), filed this action under 42 U.S.C. § 1983[1] on

April 21, 2008. At all times relevant to the allegations in the plaintiff's complaint, he was an inmate

at the Tyger River Correctional Institution ("TRCI"). Plaintiff alleges that his constitutional rights

were violated.

On July 27, 2009, the undersigned issued a report and recommendation that defendants'

motion for summary judgment be granted, plaintiff's motion for summary judgment denied, and the

case dismissed. Following said report and recommendation, the Court of Appeals for the Fourth

---

[1]All pretrial proceedings in this case were referred to the undersigned pursuant to the
provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d),DSC. Because
this is a dispositive motion, the report and recommendation is entered for review by the district
judge.

Circuit decided <u>Smith v. Ozmint</u>, 2009 WL 2366134 (4th Cir. July 31, 2009) in which the Court addressed SCDC's grooming policy in relation to the RLUIPA. On August 25, 2009, the District Judge issued an Order dismissing the motions for summary judgment without prejudice with leave to refile and specifically asked the parties to address the application of the <u>Smith</u> decision to this action. Therefore, the case was recommitted to the undersigned for further proceedings consistent with said Order.

On November 2, 2009, defendants filed a second motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure  along with a memorandum and exhibits in support of that motion. (Doc. #56).  Because the plaintiff is proceeding <u>pro</u> <u>se,</u> he was advised on or about November 9, 2009,  pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th. Cir. 1975), that a failure to respond to the defendants' motion for summary judgment with additional evidence or counter affidavits could result in dismissal of his complaint. Plaintiff filed a response in opposition on December  23, 2009.


## II.  SUMMARY  JUDGMENT STANDARD

A federal court must liberally construe pleadings filed by <u>pro</u> <u>se</u> litigants, to allow them to fully develop potentially meritorious cases.  <u>See</u> <u>Cruz v. Beto</u>, 405 U.S. 319 (1972), and <u>Haines v. Kerner</u>, 404 U.S. 519 (1972).  In considering a motion for summary judgment, the court's function is not to decide issues of fact, but to decide whether there is an issue of fact to be tried.  The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim,  <u>Weller v. Department of Social Services</u>, 901 F.2d 387 (4th Cir. 1990), nor can the court assume the existence of a genuine issue of material

fact where none exists.  If none can be shown, the motion should be granted.  Fed. R. Civ. P. 56(c).

The movant has the burden of proving that a judgment on the pleadings is appropriate.  Once the

moving party makes this showing, however, the opposing party must respond to the motion with

"specific facts showing that there is a genuine issue for trial."  The opposing party may not rest on

the mere assertions contained in the pleadings.  Fed. R. Civ. P. 56(e) and Celotex v. Catrett, 477 U.S.

317 (1986).

The Federal Rules of Civil Procedure encourage the entry of summary judgment where both

parties have had ample opportunity to explore the merits of their cases and examination of the case

makes it clear that one party has failed to establish the existence of an essential element in the case,

on which that party will bear the burden of proof at trial.  See Fed. R. Civ. P. 56(c).  Where the

movant can show a complete failure of proof concerning an essential element of the non-moving

party's case, all other facts become immaterial because there can be "no genuine issue of material

fact."  In the Celotex case, the court held that defendants were "entitled to judgment as a matter of

law" under Rule 56(c) because the plaintiff failed to make a sufficient showing on essential elements

of his case with respect to which he has the burden of proof.  Celotex, 477 U.S. at 322-323.


### III.  DISCUSSION

### A.  FACTS PRESENTED

Plaintiff alleges that his Constitutional rights were violated when  he was placed in a cell

within Unit Nine with no running water or toilet and, after having to urinate on the floor and refusing

to clean it up, he was disciplined by the SCDC officer. Specifically, plaintiff asserts that in May

2007, he was transported to TRCI due to his age and the mandatory requirements under SCDC that

he attend the G.E.D. Program and was placed in housing Unit Nine which houses inmates who are required to attend the program if under the age of twenty-one. Plaintiff alleges that on July 11, 2007, he requested to go the bathroom outside his cell but, after having to wait for more than an hour, he lost control and urinated on the floor of his cell. When Officer Long saw the urine, he brought paper towels and bleach and instructed plaintiff to clean it up. Plaintiff alleges that he stated that he would clean it up with the proper material but refused to use his bear hands. As a result of refusing to clean up the urine with the paper towels and bleach, he was brought before a disciplinary hearing and lost telephone privileges and ninety day cell restriction for failing to obey an order. Plaintiff also asserts that after his transfer to TRCI, he accepted the Islamic Faith but was denied the right to grow a beard in accord with his Islamic Faith pursuant to the SCDC Inmate Grooming Policy which he alleges is a violation of RLUIPA.

Plaintiff seeks a declaratory judgment stating that the actions of the defendants violated the Eighth Amendment of the United States Constitution, that the Inmate Grooming Standards Policy is in violation of the RLUIPA and is not the least restrictive means in compelling the defendants' interest in security.

Plaintiff seeks an injunction ordering the defendants to immediately cease dead bolting inmates in individual cells in Unit Nine that do not have toilets or running water, cease classifying inmates in Unit Nine where disciplinary infractions have not occurred, and to immediately carry out necessary changes to the inmate Grooming Policy to comply with the RLUIPA.

As stated above, the Fourth Circuit Court of Appeals decided the Smith case following the report and recommendation in which a South Carolina prisoner brought suit alleging, among other things, that the prison grooming policy violated the Religious Land Use and Institutionalized

Persons Act (RLUIPA). The Court of Appeals for the Fourth Circuit held, in relevant part, that the grooming prison policy imposed a substantial burden on the prisoner' religious practice pursuant to RLUIPA and that the summary judgment affidavit relied on by the defendants failed to demonstrate that the grooming policy furthered a compelling governmental interest by the least restrictive means. Id. at 5-7. The District Judge in this case, out of an abundance of caution and the interests of justice and before considering the motion for summary judgment as to the RLUIPA issue, required briefing regarding the application of Smith, supra, to the instant action. (See Order, doc. #44).

Accordingly, defendants filed a second motion for summary judgment along with affidavits and exhibits in support. Defendants argue the Court in the Smith case did not find SCDC's grooming policy to be unconstitutional, but rather the Court was critical of an affidavit submitted in support of the motion for summary judgment stating that it did not address why the grooming policy satisfied the least restrictive means requirement under RLUIPA. Defendants further argue that claims regarding the RLUIPA and Grooming Policy should be dismissed as the record clearly demonstrates that the SCDC policies further a compelling governmental interest and is the least restrictive means necessary.

Additionally, defendants assert that there is no constitutional violation as to conditions of confinement because inmates are given access to running water and to toilet facilities on a regular basis and upon their request. Defendants argue that plaintiff has only requested injunctive relief so that the claims related to conditions of confinement in Unit Nine are moot as he is no longer in Unit Nine due to reaching the age of 21.

Defendants also argue that they may not be held liable under a *respondeat superior* theory,

that the record fails to demonstrate personal involvement of each defendant in the alleged deprivations, and that they are entitled to both Eleventh Amendment Immunity and Qualified Immunity.


## B.  CONDITIONS OF  CONFINEMENT

As previously stated, plaintiff argues that due to his young age, he was transferred to TRCI and housed in Unit Nine which does not contain toilets and running water in the cells. Plaintiff asserts that the officers make a walk through every hour and, on July 11, 2007, he asked to go to the bathroom when the officer was making the walk through and was told to hold on a minute. After not returning within thirty minutes, plaintiff alleges he got defendant Sergeant Long's attention but that Sergeant Long held up his hand for plaintiff to stop banging on the door to his cell and did not come to let him use the bathroom. Plaintiff alleges that when he felt he was losing control of his bodily functions, he attempted to urinate under his cell door to keep his cell from retaining the urine. After refusing to clean the urine up with paper towels and bleach, he was disciplined. Plaintiff requests injunctive and declaratory relief only. Plaintiff requests an injunction ordering the defendants to cease dead bolting inmates in individual cells in Unit Nine, and to cease classifying inmates in Unit Nine under regulations that are arbitrary to SCDC Policy.

As plaintiff is no longer housed in Unit Nine due to obtaining the age of 21, and completing his GED, and Unit #9 at TRCI houses male inmates under the age of twenty-one (21) (See Affidavit of Defendant Warden Riley ) his request for declaratory or injunctive relief with regards to these issues are MOOT as he is no longer subjected to the conditions complained of in Unit Nine. Claims for injunctive and declaratory relief become moot when a prisoner is no longer subjected to the

condition of which he complains. <u>Williams v. Griffin</u>, 952 F.2d 820, 825 (4th Cir. 1991); <u>Ross v.</u>

<u>Reed</u>, 719 F.2d 689, 693 (4th Cir. 1983).[2]


## C. INMATE GROOMING POLICY and RLUIPA

As previously discussed, plaintiff alleges that he converted to the Islamic faith after entering

the TRCI and that the Inmate Grooming Policy ("the Policy") denying him the right to grow a beard

violates the RLUIPA.

Defendants submitted the affidavit of Timothy M. Riley dated November 9, 2009, who

attests that he is the Warden at TRCI and has served in the correctional field in excess of 24 years.

(Affidavit of Timothy Riley, doc. #56-2). Riley has reviewed plaintiff's inmate records, allegations

in the complaint, and attached a copy of plaintiff's disciplinary history and SCDC's Grooming

Policy. (<u>Id.</u>). At the time of the affidavit, Riley attests plaintiff was housed in the Special

Management Unit (SMU) which is a housing unit for inmates who have been charged with violent

and/or serious behavior issues committed while in the general population. (<u>Id.</u>). The SMU is a

control unit and designed to control inmates' behavior and to maintain internal security. (<u>Id.</u>). Riley

attests that the inmates assigned to SMU at TRCI are the most violent, dangerous, and disruptive

---

[2] Eighth Amendment protection from cruel and unusual living conditions has both objective and subjective components. Conditions must rise to the level of a deprivation of a basic human need such as food, warmth, or exercise. <u>Williams v. Griffin</u>, 952 F.2d 820, 824 (4th Cir. 1991). In addition, prison officials cannot be held liable under the Eight Amendment unless they knew of and disregarded an excessive risk to inmate health or safety. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).The plaintiff has failed to prove that he was deprived a "basic need" and that this deprivation was attended by deliberate indifference on the part of the defendants. <u>Strickler v. Waters</u>, 989 F.2d 1375, 1379 (4th Cir., <u>cert. denied</u>, 510 U.S.949 (1993)). To the extent plaintiff relieved himself on the floor, a single episode does not rise to the level of a constitutional infringement.

inmates at TRCI, and these inmates pose serious security risks to other inmates and to corrections personnel. (Id.). Plaintiff has been housed in various units within TRCI but has been housed within the general population since reaching the age of 21. (Id.). Plaintiff has a history of being housed in SMU because of violent behavior and because of numerous disciplinary violations. (Id.). Plaintiff was sent to SMU on October 2, 2009, to serve a 540-day term for possession of contraband. (Id.).

Riley attests that it is critical that SCDC officials be able to take action to forcibly groom inmates who are not compliant because non-compliance with one policy or procedure will only encourage inmates to be non-compliant or refuse orders in other areas which results in a loss of authority and control over that inmate and the unit. (Riley affidavit). Tolerance for non-compliance will only encourage further rules violations by that inmate and will also serve to encourage other SCDC inmates to do the same which erodes authority and control of the correctional staff. (Id.). SMU inmates are encouraged to comply with SCDC rules to earn their way back to the general population. (Id.). Further, Riley asserts that all inmates within SCDC are subject to the requirements of SCDC Policy No. Op-22.13 entitled "Inmate Grooming Standards" which is an institution-wide policy that sets forth a minimum standard for all SCDC inmates. (Id.). Riley attests that SCDC Policy No. Op-22.13 requires all male inmates to have their hair neatly cut not to exceed one inch in length and hair must remain above the shirt collar and above the ear (Id.). Said policy prohibits "beards, sideburns, goatee, etc. A mustache is authorized; however, it must be neatly trimmed and must not extend beyond the corner of the mouth or extend over the lip." (Id., and policy, exhibit C). This SCDC policy also prevents inmates from growing excessive fingernails, requires standards of cleanliness and personal hygiene, prohibits piercings and tattooing, and sets forth standards for the wearing of assigned inmate uniforms. (Id.). Riley states that the failure of an inmate to comply with

the grooming requirements subjects the inmate to disciplinary violations and "inmates may be given forced haircuts or shaves by security staff only if they refuse to comply with the haircut and shave policy" pursuant to Paragraph 3.3 of SCDC Policy No. Op-22.13. (Id.).

Riley attests that SCDC Policy No. OP-22.12 allows inmates to be "shaved when haircuts are given or to be issued a disposable razor by security staff after the inmate enters the shower" and is to be "returned by the inmate to security staff before he leaves the shower. (Id.). Razor restrictions can be imposed by the SMU Security Supervisor for security and/or mental health concerns." (Id.). In 2004, Riley asserts the grooming policy was amended to require all inmates, including any inmates claiming a religious objection to the grooming standards, to be in compliance with the Grooming Policy and authorized the use of forced haircuts or shaves if an inmate refused to comply with policy. (Id.).

Riley attests that the Grooming Policy serves important security and other penological interests applicable to inmates in the general population and inmates housed in higher security classifications. (Riley affidavit). Maintaining and running a prison facility requires interaction between inmates and SCDC personnel, and often includes close interaction involving hands-on physical contact. (Id.). Riley contends the Policy alleviates contraband, personal hygiene and sanitation problems. (Id.). Short hair is easier to inspect and there is less chance for contraband to escape detection in short hair and no beard. (Id.). Riley attests that he is aware of instances where inmates have hidden contraband, including drugs and items that could be used as weapons, in their hair when they were permitted to wear dreadlocks or otherwise have long hair. (Id.). Riley attests that, in January 2004, there was a disturbance in the SMU at Broad River Correctional Institution which occurred when SCDC Policy allowed SMU inmates to wear long hair, there were a number

of keys missing and it is believed that inmates with long hair and beards were able to conceal those keys in their hair or beard. (Id.). It was not until all inmates were subjected to haircuts and shaves were the keys located. (Id.). Keys and contraband pose a threat to the safety and welfare of inmates, SCDC staff, and to the general public. (Id.). Restraint devices used within the SCDC use a common type of small key that can be easily concealed in longer hair. (Id.). With the ability to obtain or manufacture devices capable of opening the restraints, inmates have the possibility of escape, assault, or some other purpose. (Id.). Riley asserts that long hair and beards also create a safety risk for the inmates themselves making them more vulnerable to other inmates, particularly during an assault where an inmate with long hair would be susceptible to having another inmate grab or hold by the hair. (Id.). For example, Riley attests that in the SMU at Evans Correctional Institution on June 15, 2000, an incident occurred where the inmates were evacuated from the unit and placed in a recreational cage where fighting broke out among the inmates and one inmate was badly beaten. (Id.).

Riley attests that in his experience, inmates will use feces and other bodily fluids as an offensive weapon to assault staff members by smearing the feces, blood, urine, and/or semen on their cells, their property, and themselves, including their hair, in an attempt to reduce the willingness of staff to thoroughly search the hair. (Id.). Riley asserts that prior to the Grooming Policy, inmates placed sharp objects such as needles, hooks, pins, staples, and other small objects in their hair for the purpose of injuring the staff member assigned to search the hair and other areas which presented a threat to safety of the staff by potentially "sticking" the staff member and possibly transmitting life-threatening blood-borne pathogens. (Id.). An inmate's use of bodily fluids in their hair exacerbated this risk and inevitably reduced the thoroughness and effectiveness of hands-on searches

of hair. (Id.).

Further, Riley attests that a policy whereby inmates such as plaintiff would be allowed to grow their hair and beards also creates security concerns in the event of an escape and all inmates are threats to escape particularly during transport to medical facilities, courthouses, and other outside facilities which has happened thereby threatening the public safety. (Id.). By having the long hair and beards, inmates would be able upon escape to dramatically alter their appearances which would assist them in avoiding detection and re-capture. (Id.). Therefore, Riley asserts the short haircut and no beard policy serves as a deterrent to escape attempts and assists in the re-capture efforts when an escape does occur. (Id.).

Riley attests that if an SMU inmate was permitted to not comply with the grooming standards, then he likely would never qualify to be released to the general population. (Id.). The SMU unit must be utilized to house inmates who pose serious security risks and having a beard or longer hair increases these security risks, and would likely lead to more inmates being placed in SMU when these units should be reserved for the inmates who are violent and pose serious security threats within the institution. (Id.). Riley asserts in his professional judgment, an exemption to the grooming policy for inmates based on religious reasons would not be practical and would not work because SCDC officials would be faced with inmates asserting religious reasons for not complying with the policy even if those reasons may not be legitimate or sincere. (Id.). SCDC officials would then be forced to make a judgment call based on an inmate's behavior and actions as to which inmate had a sincere religious belief and which did not. (Id.). Riley attests that this would subject SCDC officials to more grievances and more lawsuits and would lead to a need for increased manpower and resources to cover the hygiene and sanitation problems and security concerns. (Id.).

Riley attests that in the past, SCDC did attempt to accommodate inmates who chose not to cut their hair. (Id.). Beginning in 1996 until 2004, inmates who chose not to submit to the Grooming Policy were allowed to grow their hair but were reclassified to a higher custody level. (Id.). As a result, those inmates were housed in SMUs. (Id.). However, Riley attests that this approach did not work as it did not alleviate the security, hygiene, identification, and contraband issues. (Id.). Therefore, in May 2004, SCDC Director Jon Ozmint changed the Policy resulting in all inmates, regardless of custody classification, are subject to forced haircuts and shaves if not in compliance with the policy. (Id.).

As to plaintiff's issue concerning different grooming standards for male and female prisoners, Riley attests it is well recognized in corrections that male and female prisoners present different issues. (Riley affidavit). Riley asserts that the number of male inmates far exceeds the number of female inmates, female inmates generally to not present the type of security concerns, SCDC as a whole does not have problems with the female inmates rioting, taking hostages, assaulting correctional staff or other inmates with deadly force, using their hair to hide such contraband as weapons or handcuff keys, and there are no significant escape issues with female inmates. (Id.). Riley attests that because of the lack of facial hair and certain limitations on the types of hair styles which are permitted, female inmates are unable to dramatically change their appearance to even remotely the degree that male inmates could if allowed long hair and beards. (Id.).

Riley attests that he reviewed the affidavit filed by Robert E. Ward, Director of Division Operations within the SCDC, in the Smith case and believes the statements made by Mr. Ward to be equally applicable in the present case. (Id.). Riley states that while Ward's affidavit deals mainly

with the Maximum Security Unit (MSU) and not the SMU within the SCDC, he believes the statements outlined by Mr. Ward in his affidavit to be applicable to all SCDC inmates within the general population and within the SMUs  (Id.).

Defendants submitted a copy of the affidavit of Robert E. Ward ("Ward"), Director of the Division of Operations for the SCDC, that was presented in the Smith case (0:04-1819-PMD-BM). (Ward affidavit, doc. #56-3). Ward attests that his responsibilities include overseeing the operations of the most secure prisons, Level 3 Facilities, that are operated by the SCDC. (Id.). MSU inmates are subject to the requirements of SCDC Policy "Inmate Grooming Standards" which provides restrictions on inmate grooming and sets a minium standard for all SCDC inmates. (Id.). Ward attests that this Policy requires all male inmates to have their hair "neatly cut (not to exceed one inch in length) and must remain above the shirt collar and above the ear (not touching the ear)."  The Policy also prohibits "braids, plaits, Afros, blow-outs, Mohawks, etching of design  or patterns, or other extreme styles" and prevents inmates from growing excess fingernails, requires standards of cleanliness and personal hygiene, prohibits piercings and tattooing, and sets forth standards for the wearing of the assigned inmate uniform. (Id.). The failure of an inmate to comply with the grooming requirements subjects the inmate to disciplinary violations. (Id.). Ward asserts that MSU inmates who refuse to shower may be forcibly showered and those inmates who refuse to shave and/or have their hair cut may be given forced haircuts or shaves. (Id.).  The SCDC Policy was amended in 2004, to require all inmates, including any inmates claiming a religious objection to the grooming standards, to be in compliance with the Grooming Policy and authorized the use of forced haircuts or shaves if an inmate refused to comply with the policy. (Id.). Ward attests that the Grooming Policy applicable to MSU inmates, including the use of forced haircuts and shaves, serves important

security and other penological interests. (Id.). The requirement that inmates keep their hair short allows the searches that are required of MSU inmates including inspections of the inmate's hair to be less time-consuming and more fool-proof. (Id.). Therefore, Ward contends that short hair is easier to inspect and thus less chance for contraband to escape detection in short hair and where an inmate is not permitted to wear a beard. (Id.). Ward attests that the requirement in MSU for inmates to comply with the grooming standards and be subject to forced haircuts and shaves if not in compliance alleviates personal hygiene and sanitation problems and inmates cannot effectively use their hair or beards as a place to hide contraband. (Id.). Long hair and beards also present a health risk from the increased risk of communicable parasites such as lice and scabies. (Id.). Therefore, Ward attests that the current Grooming Policy reduces the threat of a parasitic outbreak within the prison population, thereby increasing the safety and security of staff and other inmates. (Id.). The long hair and beards also create a safety risk of the inmates making them more vulnerable to other inmates. (Id.). Thus, Ward asserts the closely cropped haircuts and no beards serve as a possible deterrent to escape attempts and clearly assist in the re-capture efforts when an escape does occur since they cannot dramatically alter their appearance. (Id.). Ward attests that it is well recognized in corrections that male and female prisoners present very different issues and SCDC as a whole does not have problems with female inmates rioting, taking hostages, assaulting correctional officers or other inmates with deadly force, or using their hair to hide contraband as weapons or handcuff keys. (Id.). Ward attests that the SCDC does not have any significant escape issues with female inmates such as the ability to dramatically change one's appearance after escape and, because of the lack of facial hair and certain limitations on the types of hair styles which are permitted, female inmates are not able to dramatically change their appearance to even remotely the degree that male

inmates could if allowed long hair and beards. (Id.). Ward attests that female inmates are not permitted to wear dreadlocks or similar hairstyles pursuant to the Grooming Policy. (Id.).[3]

Defendants also submitted a copy of the affidavit of Sandra Barrett ("Barrett"), Warden at the Goodman Correctional Institution populated solely by female inmates, that was presented in the Smith case (0:04-1819-PMD-BM). (Barrett affidavit, doc. #56-4). Barrett attests that she has worked with and supervised both male and female inmate populations, has had significant experience with both genders in prison settings, and is qualified to address the fundamental differences between male and female inmate populations and how those populations are managed from a corrections perspective. (Id.). Barrett attests that male and female inmate populations are significantly different and present different safety and security concerns and challenges. (Id.). Barrett asserts the intrinsic differences in inmate populations based on gender and the difference in how male and female inmate populations are managed have been acknowledged and recognized by major corrections organizations such as the National Institute of Corrections. (Id.). Barrett attests that she has experienced and observed the differences first-hand during her correction's career. (Id.). In her experience, Barrett attests that male inmates tend to solve their problems and disputes through confrontation and force or a show of force, and they frequently acquire or hand make weapons for use in confrontations with other inmates and correctional staff. (Id.). In contrast, female inmates rarely are found to be in possession of "shanks" or other types of weapons, female inmates typically will voice their complaints about whatever issue they have whether with another inmate, a staff member, or the institution rather than act in a violent manner. (Id.). Barrett attests that female

_____

[3] In this current case, Plaintiff Bailey is seeking to be allowed to grow a beard which would not apply to female inmates.

inmates are much less likely to use physical confrontation or violent acts to settle disputes. (Id.). Barrett has observed significant differences in the social structure and hierachy in male and female inmate populations. (Id.). Male inmates are more inclined to form gangs for protection and to commit criminal acts, including violent acts, within the prison setting. (Id.). In contrast, Barrett attests that female inmates tend to form what are in essence "family units" within the prison system. (Id.). These family units are oriented toward problem solving and nurturing as compared to the male mindset of physical intimidation, coercion, violence, and other criminal behavior. (Id.). Barrett contends that the management of the male and female inmate populations within prison presents very different challenges and often requires very different responses, procedures, and programming. (Id.).

Barrett has observed a significant difference in hygiene practices between male and female inmates wherein male inmates tend to have a much poorer level of personal hygiene than female inmates. (Id.). Male inmates have a much higher tolerance or acceptance of poor hygiene, both for themselves and others whereas female inmates tend to be hyper-hygienic and care more about their appearance. (Id.). Therefore, Barrett attests that the concern about maintaining suitable levels of personal hygiene presents a much greater challenge in male populations than female. (Id.).

Barrett attests that male inmates have a much greater tendency to utilize bodily fluids as a weapon. (Id.). Barrett is personally aware and has also been informed of instances where male inmates have used feces, urine, ejaculate, and even blood not only to throw on staff members but also to coat certain objects or themselves, including their hair. These type of issues are more prevalent in higher custody units, such as lock-up units. This behavior is not found in the female inmate population. (Id.).

16

Barrett attests that long hair in male inmate populations also presents a hygiene and security issue for staff assigned to search the hair. (Id.). The poor hygiene very often exhibited in male inmates unless corrected, especially as compared to female inmates, makes it much more likely for the male inmates to develop parasites or other health issues if they do not maintain proper hygiene. (Id.). Thus, Barrett asserts that male inmates are more likely to expose other inmates and staff to the transmission of these parasites such as lice and scabies. (Id.). Further, Barrett contends that it is more difficult and less effective for correctional staff to conduct proper searches of the hair which presents security concerns. (Id.).

Barrett attests that the current hair grooming standards prohibit the wearing of dreadlocks by both male and female inmates. (Id.). The male and female populations are treated the same in this regard. (Id.). Barrett asserts that male inmates also present different security concerns because escapes by female inmates, as compared to males, are very rare. Barrett attests that this reality is reflected in the absence of a "supermax" type facility for female inmates within the Department and it is very unusual for female inmates to be confined in lock-up units, such as SMU, for violent offenses such as serious assaults or possession of weapons. (Id.).

Defendants argue that plaintiff's claims regarding the SCDC grooming policy and claims regarding the RLUIPA must be dismissed as a matter of law because the record clearly demonstrates that the SCDC policies further an important governmental interest and is the least restrictive means necessary.

In their memorandum, defendants rely on the language by the Fourth Circuit in Hines v. South Carolina Department of Corrections, 148 F.3d 353 (4th Cir. 1998), as instructive on the issue of a compelling governmental interest. Defendants contend that the SCDC Grooming Policy "May

17

have an incidental effect of preventing the inmates from wearing their hair and beards as their religion prescribes."  (Memorandum, p.10). However, defendants argue the same legitimate and compelling governmental objectives as described in <u>Hines</u>, <u>supra</u>, as well as other objectives, are discussed at length in the affidavits of Riley and Ward. (Defendants' memorandum). Specifically, defendants argue  the Grooming Policy allows the SCDC to maintain order and discipline to all inmates at the SCDC but is particularly necessary in the higher security classifications where plaintiff is currently housed. (<u>Id.</u>). It allows the correctional staff to maintain control over all aspects of the inmate's life and teaches the importance and necessity for following the rules and regulations to inmates who have exhibited a constant and consistent refusal to follow institutional rules and is important in making the SMU a properly functional control unit as a means to maintain order and discipline which is a compelling interest. (<u>Id.</u>). Defendants contend the Grooming Policy also serves other compelling interests as a method of combating contraband which is a compelling governmental interest as held in <u>Hines</u>, <u>supra</u>. (<u>Id.</u>). Further, defendants argue the Grooming Policy serves the interest of safety for both the inmates and the correctional staff and allows for identification of inmates upon escape as well as acts as a deterrent to escapes. (<u>Id.</u>). Defendants assert that the <u>Hines</u> court was examining general population inmates, and the plaintiff in this case is currently housed in SMU which is a higher security classification. (<u>Id.</u>). The Grooming Policy as applied and enforced within SCDC "serves to maintain safety and security, reduce unsanitary conditions, and other hygiene issues for the officers who interact with the inmates, foster the safety of inmates and staff, reduce opportunities for the hiding of contraband, prevent inmates from dramatically altering their appearance in the event of an escape, and deter escape activity." (<u>Id.</u>  at p. 10).

Defendants further argue the enforcement of the Grooming Policy is the least restrictive

means of accomplishing the compelling governmental objectives. (Defendants' memorandum). Defendants refer to Riley's affidavit that objectives of preventing and deterring escapes are furthered by the grooming policy and cannot be addressed by any less restrictive means because inmates have and will continue to escape from SCDC. (Id.). However, by requiring all inmates to wear their hair closely-cropped and without beards prevents inmates from being able to alter their appearance upon escape and aids in the re-capture process. (Id.). Additionally, the Court in Hines held that "[s]earches of inmates with long hair are less effective and more time-consuming than searches of inmates with short hair." Hines, 148 F.3d at 358. (Id.).

In 2000, Congress enacted the RLUIPA, 42 U.S.C. § 2000cc-1(a)(1)-(2), which provides in part: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the burden furthers "a compelling governmental interest," and does so by "the least restrictive means." In passing RLUIPA, Congress "resurrected RFRA's language, but narrowed the scope of the act, limiting it to laws and regulations concerning institutionalized persons or land use." Murphy v. Missouri Dept. Of Corrections, 372 F.3d 979, 987 (8th Cir. 2004). The proper standard of review under RLUIPA is: (1) have the defendants imposed a substantial burden on the plaintiff's exercise of religion; (2) does the substantial burden further a compelling governmental interest; and (3) has it been done by the least restrictive means. *See* Lovelace v. Lee, 472 F.3d 176, (4th Cir. 2006). Once a plaintiff produces prima facie evidence that a policy imposes a substantial burden on his religious exercise, the government bears the burden of persuasion to prove that the burden in question is the least restrictive means of furthering a compelling governmental interest. Id. "As to those elements on which it bears the burden of proof, a government is only entitled to summary judgment if the proffered evidence is such that a rational

fact-finder could only find for the government." Smith, 578 F.3d at 250.

For purposes of this motion, there is no dispute as to the first element. However, defendants assert they satisfy the second and third elements.

Compelling Interest

Initially, the defendants must take the "unremarkable step of providing an explanation for the policy's restrictions that takes into account any institutional need to maintain good order, security, and discipline or to control costs." Smith v. Ozmint,[4] 578 F.3d 246, 252 (4th Cir. 2009)(quoting Lovelace v. Lee, 472 F.3d 174, 190 (4th Cir. 2006)). When analyzing the governmental interests presented, "context matters." Cutter v. Wilkinson, 544 U.S. 709, 722-23 (2005). Security issues carry "particular sensitivity." Id. at 722. "Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions." Id. at 723 (citations omitted). "They anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources. Id. (Quotations omitted).

The Fourth Circuit has recognized as compelling governmental and penological interests in the context of a grooming policy "suppress[ing] contraband, limit[ing] gang activity, maintain[ing] discipline and security, and prevent[ing] inmates from quickly changing their appearance." See

_____

[4]The Smith case was remanded by the Fourth Circuit for further proceedings. Following remand, the district judge adopted the magistrate judge's recommendation finding that the "Grooming Policy" served compelling governmental interests and used the least restrictive means of furthering those interests. See Smith v. Ozmint, No. 9:04-1819-PMD-BM.

Hines v. SCDC, 148 F.3d 353, 358 (4th Cir. 1998). The Hines court examined the grooming policy in relation to general population inmates. The case at hand involves SMU inmates which clearly invokes at least the degree of governmental and penological interests present in Hines.[5]

In the instant matter, the defendants have established that the SMU Grooming Policy furthers compelling governmental interests. Specifically, the affidavits of Riley, Ward, and Barrett submitted by the defendants establishes that the grooming policy, including the ability to forcibly groom inmates, furthers the compelling interests of order, control and discipline, security and safety.


Least Restrictive Means

Defendants must also show that the grooming policy is the least restrictive means of furthering the governmental interests. They must "provide a substantive, relevant explanation as to why [grooming policy] are the least restrictive means of enforcing the compelling interest[s]." Smith. 578 F.3d at 253. As discussed above, a district judge in this court has held under similar facts the Grooming Policy to be the least restrictive means of furthering compelling governmental interests. See Smith v. Ozmint, No. 9:04-1819-PMD (docket entry #307). Other courts have already found that grooming regulations, including the forced haircuts, meet the least restrictive means test under a strict scrutiny analysis. See, e.g., Fegans v. Norris, 537 F.3d 897, 905-06 (8th Cir.2008); Hoevenaar v. Lazaroff, 422 F.3d 366, 371-72 (6th Cir.2005); Daker v. Washington, 469 F.Supp.2d 1231, 1239 (N.D.Ga.2007). The courts should approach this analysis giving "due deference to the experience and expertise of prison and jail administrators." See Cutter, 544 U.S. at 722-23. See also

---

[5] The Fourth Circuit in Smith was puzzled by the evidence presented. Specifically, they noted that the primary affidavit submitted by the defendants "was not written to address the case. . . ." Smith, 578 F.3d 253.

generally, Woodard v. Ngo, 548 U.S. 81, 93 (2006).

Prison administrators do not have to refute every conceivable option to satisfy the least restrictive means prong of [RLUIPA]." Hamilton v. Schriro, 74 F.3d 1545, 1556 (8th Cir.1996) (applying RFRA); accord Spratt v. R.I. Dep't of Corr., 482 F.3d 33, 41 n. 11 (1st Cir.2007) (suggesting that "to meet the least restrictive means test, prison administrators generally ought to explore at least some alternatives, and their rejection should generally be accompanied by some measure of explanation") (applying RLUIPA). As Justice Blackmun has recognized, "[a] judge would be unimaginative indeed if he could not come up with something a little less 'drastic' or a little less 'restrictive' in almost any situation, and thereby enable himself to vote to strike [regulation] down." Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 188-89, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) (Blackmun, J., concurring) (criticizing the least restrictive means test as a "slippery slope" of uncertainty). Otherwise, federal judges would become "the primary arbiters of what constitutes the best solution to every religious accommodation problem" in state penal institutions. Lovelace, 472 F.3d at 215 (Wilkinson, J., dissenting).

Riley attests, the defendants previously allowed inmates in lower custody levels (such as general population) to be reclassified and housed in the SMU if they desired to grow long hair/beards. Riley asserts that attempt failed to alleviate the compelling interests at issue. (See Riley Aff.). Therefore, defendants have presented evidence that other alternatives have been tried but failed. (Id.). Riley asserted that SMU inmates still manage to obtain or make escape tools and weapons even though they are more restricted than inmates housed in the general population. (Id.). Such items are very dangerous and can be hidden in long hair and beards and can be used for the purpose of assaulting staff, facilitating escape, and other activities that threaten the unit's security

and safety. (Id.).

Based on the evidence, defendants considered and rejected alternative approaches. See Lovelace, 472 F.3d at 217. In addition, a religious exemption would be nothing more than the absence of a policy to address the compelling governmental interests at the SMU. It would not offer an alternative, much less a "lesser restrictive means," to address the compelling interests of safety and security created by long hair and beards in the SMU. The Fourth Circuit has already determined that such an approach would not serve these compelling interests. See McRae v. Johnson, 261 Fed. Appx. 554, 559 (4th Cir.2008) (finding that an exemption, effectuated through segregation, "would not alleviate the security concern associated with housing all inmates claiming religious exemption in the same facility, as those individuals, without being isolated from each other, would have access to each other along with the ability to hide contraband in their long hair and/or beards" ).

In Smith, the Fourth Circuit was critical that the defendants had made "no attempt whatsoever to explain that hygiene and security concerns in the MSU cannot be accommodated without forcibly shaving the heads of prisoners who wear long hair." Smith, 578 F.3d at 253. In contrast, the affidavits submitted by the defendants in the instant matter clearly explain why the Grooming Policy is the least restrictive means of furthering compelling governmental interests in the SMU, specifically the preservation of safety and security in light of the specific risks posed by hidden weapons and contraband in inmates' long hair/beards. The Grooming Policy addresses these compelling interests by eliminating such risks.

There has not been any suggestion to this Court as to another way the serious safety and security concerns posed by long hair/beards at the SMU could be addressed other than to keep the hair short and the faces shaven, even if by force. The defendants have met their burden by

"provid[ing] a substantive, relevant explanation," which is deserving of due deference, as to why the Grooming Policy is the least restrictive means of furthering the compelling interests of preserving safety and security in light of the risks posed by inmates' long hair and/or beards. The defendants have not refuted every conceivable option, but they have explored alternatives. Based on the pleadings and all affidavits, this court finds that a reasonable fact-finder could only find that the Grooming Policy is the least restrictive means of addressing the compelling interests associated with inmates' long hair and/or beards at the SMU.

Equal Protection

For the first time, plaintiff appears to argue an Equal Protection claim in his response in opposition to summary judgment. Therefore, as plaintiff did not raise an Equal Protection claim in his amended complaint, this issue should be dismissed.

In the alternative, as to any claim plaintiff attempts to make with regard that the Grooming Policy violates his equal protection by discriminating against male inmates, alleging female inmates are not subject to the same policy, fails. To invoke the Equal Protection Clause, plaintiff must show that he was similarly situated to other inmates.  See Plyler v. Doe, 457 U.S. 202 (1987). The Equal Protection Clause essentially mandates "that all persons similarly situated should be treated alike." Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985);  See Cook v. Babbitt, 819 F.Supp. 1, 9 (D.D.C.1993). Plaintiff does not allege that he was treated differently than any other similarly-situated male inmate or that he was singled out for harsher treatment. See Motto v. Rider 2008 WL 4224814 (S.D.W.Va. Sept. 9, 2008) *citing*  McClelland v. Sheriff's Deputy, 2001 WL 34826228 (E.D.Va.2001)(finding that plaintiff's gender discrimination claim should be dismissed because male

and female inmates are "differently situated as groups, thus justifying the differing treatment");

Ashann-Ra v. Commonwealth of Virginia, 112 F.Supp.2d 559, 571 (W.D.Va.2000)(finding no equal protection violation where prison regulations were applied with parity to both male and female inmates because all inmates were required to comply with grooming restrictions and face sanctions for noncompliance).

The Smith case questioned the different grooming standard for men than for women and why this standard worked for female inmates but not male inmates. As set forth above, Riley and Barrett attests that it is well recognized that the standards for male and female prisoners present different issues. The number of males far exceeds the number of female inmates, female inmates do not present the type of security concerns as presented by male inmates, SCDC as a whole does not have problems with female inmates rioting, taking hostages, assaulting the correctional staff or other inmates with deadly force, or even using their hair to hide such contraband as weapons or handcuff keys. Furthermore, there are no significant escape issues with female inmates such as the ability to dramatically change one's appearance after escape because of the lack of facial hair and certain limitations on the types of hair styles permitted. Female inmates are unable to "dramatically change their appearance to even remotely the degree that male inmates could if allowed long hair and beards." (Riley affidavit). Plaintiff has not presented any evidence to question Barrett and Riley's testimony.[6]

Based on the evidence submitted, the standards for female inmates would not serve the compelling governmental interests that the Grooming Policy does as applied to male inmates.

---

[5] It is noted that plaintiff's equal protection argument is based on gender and he asserts a religious claim to growing a beard. Obviously, facial hair typically is not an issue with females.

## IV. CONCLUSION

Based on the reasons stated above, it is RECOMMENDED that defendants' motion for summary judgment (Doc. #56) be GRANTED IN ITS ENTIRETY.

It is FURTHER RECOMMENDED that any other outstanding motions be deemed MOOT.


Respectfully submitted,


s/Thomas E. Rogers, III
Thomas E. Rogers III
United States Magistrate Judge

July 15, 2010
Florence, South Carolina

**The parties' attention is directed to the important information on the attached notice.**